# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Docket No. 2:22-cr-00132-NT |
| | ) |
| MERIDETH C. NORRIS, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE SEIZED PURSUANT TO TWO SEARCH WARRANTS AND TO DISCLOSE GRAND JURY TESTIMONY AND MATERIALS

Before me is Defendant Merideth C. Norris's motion to suppress (ECF No. 73) and motion to disclose grand jury testimony and materials (ECF No. 122). For the reasons stated below, the Defendant's motions are **DENIED**.

## FACTUAL BACKGROUND[1]

The Defendant, Merideth C. Norris, D.O., is a licensed medical doctor in Maine. *See* Hr'g Tr. Day 1 51:1–51:3, 70:4–70:7 (ECF No. 140). She has a solo practice in Kennebunk, Merideth C. Norris P.A., which does business as "Graceful Recovery" (the "**Practice**"). *See* Hr'g Tr. Day 1 51:15–51:24, 57:24–58:1. She also practices at Savida Health, CAP Quality Care, and Enso, LLC. Hr'g Tr. Day 1 65:4–65:10. In 2021 and 2022, Dr. Norris came under investigation for her drug-prescribing practices by both the state licensing board and a federal strike force.

---

[1]     This factual background is drawn from testimony and exhibits admitted at the evidentiary hearing held before me on February 7 and 12, 2024 (ECF Nos. 132, 136) and the exhibits submitted in connection with this motion and the Defendant's Motion to Suppress Patient Records, which is addressed in a separate order.

## I.     The State Board of Osteopathic Licensure Investigation

On November 3, 2021, Walmart sent Dr. Norris a letter informing her that Walmart and Sam's Club pharmacies would no longer fill her prescriptions for controlled substances based on a review of her controlled substance prescribing patterns and other factors. Def.'s Mot. to Suppress for Violation of Fourth Amendment and for a "Franks" Hr'g ("***Franks* Mot.**") (ECF No. 73) Ex. 1, at 98 (ECF No. 73-1); Gov't Hr'g Ex. 33. Dr. Norris discussed the letter with Amanda Mahan, the Executive Director of the Maine Osteopathic Association. Hr'g Tr. Day 1 23:5–23:24. With Dr. Norris's approval, Mahan, who was concerned about Walmart's prescription-filling policies, not Dr. Norris's medical care, forwarded the letter to the State of Maine Board of Osteopathic Licensure (the "**Board**"). *Franks* Mot. Ex. 1, at 97; Hr'g Tr. Day 1 23:5–24:9.

On December 29, 2021, the Board sent a subpoena to Dr. Norris seeking the complete medical records for five patients that she serviced from July 1, 2021 to December 15, 2021. Gov't Opp'n to Def.'s Mot. to Suppress for Violations of Def.'s Fourth and Fifth Amendment Rights and Violations of Ct. Order for Disclosure and Use of Patient Rs. (ECF No. 86) Ex. 1 ("**Board Subpoena**") (ECF No. 86-1). On February 10, 2022, the Board voted to initiate a complaint against Dr. Norris's license. *Franks* Mot. Ex. 1, at 89; Gov't Hr'g Ex. 19, at 00001295. The Board also subpoenaed a sixth patient's records. Hr'g Tr. Day 2 219:20–219:22.

On June 16, 2022, the Board sent a letter to Dr. Norris informing her of the complaint against her. *Franks* Mot. Ex. 1, at 89; Gov't Hr'g Ex. 19, at 00001295. The letter stated that the Board had voted to initiate the complaint upon reviewing the

five patients' records it had subpoenaed. *Franks* Mot. Ex. 1, at 89; Gov't's Hr'g Ex. 19, at 00001295. The Board indicated that it had concerns about the treatment of three of the patients. *Franks* Mot. Ex. 1, at 89; Gov't's Hr'g Ex. 19, at 00001295.

The letter also informed Dr. Norris that she had thirty days from the receipt of the notice to respond to the Board in writing. *Franks* Mot. Ex. 1, at 90; Gov't's Hr'g Ex. 19, at 00001296. In another letter dated June 16, 2022, the Board asked Dr. Norris to respond to the following questions:

> 1. Do you have plans to taper your patients who are on greater than 100 MME[2] of controlled substances? If so, what are those plans for patients [REDACTED] whose records you have already provided to the Board under subpoena?
>
> 2. What is your policy on pill counts for your patients on controlled substances? Please provide the policy if it exists and provide evidence [of] any pill counts which have been conducted.
>
> 3. Review of the records provided under subpoena indicate that one patient received a prescription for Narcan[.] What is your policy on prescribing Narcan for your patients who are on controlled substances? Please provide a copy of any existing policy.
>
> 4. How do you address the issue of patients who are being prescribed opioids and also test positive for using illegal drugs? Please provide evidence of your approach being implemented.
>
> 5. What exemptions in Board Rule Chapter 21 (copy enclosed) Section 4(2)(B)(2)(f) are you using for patients who are on doses of controlled substances greater than 100 MME, and, in particular, what exemptions are you citing for patients [REDACTED], whose records you have already provided to the Board under subpoena?

---

[2]    The Government explained in a brief in another motion in this case that "[d]osage in one or multiple concurrently prescribed opioids is measured through Morphine Milligram Equivalents ("MME"). MME measures a patient's daily dosage of opioids, based upon a conversion factor of the strength of the opioid (using morphine as a base of 1) and the quantity of the controlled substance prescribed per day." Gov't's Opp'n to Def.'s Mot. to Compel Disc. and Req. for Disc. Sanctions to Exclude Certain Expert Test. of Dr. Timothy King 2 n.2 (ECF No. 84).

Gov't's Hr'g Ex. 19, at 00001297.

The letter also contained a document called "Notice to Complainants and Licensees," which explained that Dr. Norris could find out when her complaint would be presented to the Board by checking the Board website and searching for the meeting agenda, which is posted the Friday before each of the Board's monthly meetings. Gov't's Hr'g Ex. 19, at 00001300. The notice explained that Dr. Norris could also email or call the Board to make inquiries. Gov't's Hr'g Ex. 19, at 00001300.

On September 8, 2022, the Board received a copy of Dr. Norris's response to the complaint. Hr'g Tr. 249:4–249:12. On October 13, 2022, the Board held a public meeting where it unanimously dismissed the complaint against Dr. Norris. Gov't's Hr'g Ex. 26. The next day, the Board's executive secretary sent Dr. Norris a letter informing her of the dismissal following the Board's "thorough review" and thanking her for her "thorough and compassionate care" of her patients. *Franks* Mot. Ex. 3, at 86; Gov't's Hr'g Ex. 20.

## II.    The Federal Investigation

Meanwhile, around June of 2022, the New England Prescription Opioid Strike Force (the "**Strike Force**") began investigating Dr. Norris. Hr'g Tr. Day 1 42:16–43:12, 182:6–182:11. The Strike Force included agents from the Health and Human Services Office of the Inspector General ("**HHS-OIG**"), the Drug Enforcement Administration ("**DEA**"), the Federal Bureau of Investigation ("**FBI**"), and prosecutors from the Department of Justice ("**DOJ**"). Hr'g Tr. Day 1 43:14–44:2. The main participants were FBI Special Agent (**"SA"**) Dale Wengler, DEA Diversion Investigator ("**DI**") Emma Hinnigan, and HHS-OIG Senior Special Agent (**"SSA"**)

Brian Pellerin.[3]  Hr'g Tr. Day 1 39:6–24, 43:14–44:2; Hr'g Tr. Day 2 182:14–182:17, 283:25–285:11 (ECF No. 142). The team communicated regularly through meetings, phone calls, and email to share information, devise strategy, discuss evidence, and assign tasks. Hr'g Tr. Day 1 44:14–45:15; Hr'g Tr. Day 2 184:14–185:3, 190:12–190:19, 191:11–191:14, 286:3–287:7. Team members could upload investigative material to a shared file that everyone could access. Hr'g Tr. Day 2 190:20–191:10.

### A.    Gathering Information From the Board

On June 15, 2022, the DEA issued a subpoena to the Board for any investigations, complaints, and disciplinary actions relating to Dr. Norris. Gov't's Hr'g Ex. 11; Hr'g Tr. Day 2 203:13–203:16. On July 8, 2022, DI Hinnigan received the Board's file, which included subpoenas issued by the Board, returns from the Board's subpoenas, a copy of the June 16, 2022 letter from the Board to Dr. Norris, and the "Notice to Complainants and Licensees." Hr'g Tr. Day 1 76:14–76:25; Hr'g Tr. Day 2 215:7–219:16. The returns did not include any response to the complaint from Dr. Norris. Hr'g Tr. Day 2 204:10–204:16.

DI Hinnigan was tasked with staying in contact with the Board. Hr'g Tr. Day 1 74:20–74:23, 88:10–88:18; Hr'g Tr. Day 2 197:12–197:23, 264:3–264:5. During the summer of 2022, DI Hinnigan was in contact with Susan Strout, the Board's Executive Secretary, on about ten occasions. On September 19, 2022, Strout sent a

---

[3]     Brian Pellerin is currently the chief deputy of the Cumberland County Sheriff's Office. During the period relevant to this order, he was a senior special agent with the Health and Human Services Office of the Inspector General, so I will refer to him as SSA Pellerin in this order. *See* Hr'g Tr. Day 2 283:8–283:22 (ECF No. 142).

copy of Dr. Norris's response to the Board to DI Hinnigan. Hr'g Tr. Day 2 263:20–264:19.

### B.    Order Authorizing Use and Disclosure of Patient Records

On August 17, 2022, the Government applied for an order in this Court authorizing the disclosure and use of Dr. Norris's patient substance abuse treatment records pursuant to 42 U.S.C. § 290dd-2(b)(2)(c) and 42 C.F.R. § 2.66 (Docket No. 2:22-mc-00179-KFW, ECF No. 2). In support of the application, SA Wengler submitted an affidavit. As relevant here, paragraph 11 of the affidavit contained the following paragraph:

> On June 16, 2022, the State of Maine Board of Osteopathic Licensure provided a letter to NORRIS notifying her that, after receiving a copy of Walmart's notice letter to NORRIS, it had independently reviewed five patients' records from NORRIS's office. The Board of Osteopathic Licensure determined that three of those five patients were on high doses of Methadone, with two on Benzodiazepines, without any plan to taper those medications, as part of NORRIS's treatment of their drug dependency. The letter specifically cites that NORRIS may be violating the Board's standards for professional conduct and the Board's rules regarding the use of controlled substances in the treatment of pain. *NORRIS was provided with thirty days to respond. The Government has not received a copy of that response.*

Aff. in Supp. of the United States' Appl. for *Ex Parte* Orders Authorizing the Use of Undercover Operations and Disclosure and Use of Patient Substance Abuse Treatment Rs. Ex. 1 ¶ 11 (Docket No. 2:22-mc-00179-KFW, ECF No. 2-1) (emphasis added); Gov't's Hr'g Ex. 16; Def.'s Hr'g Ex. 20.

On August 25, 2022, Magistrate Judge Wolf issued an *ex parte* Order for Disclosure and Use of Patient Records (the "**Patient Records Order**"), which authorized the Government to access and use patient records from the Practice and

Savida Health to investigate and prosecute Dr. Norris. Order for Disclosure and Use of Patient Rs. (Docket No. 2:22-mc-00179-KFW, ECF No. 5); Gov't's Hr'g Ex. 9. On October 13, 2022, Judge Wolf amended the Patient Records Order to cover patient records obtained from CAP Quality Care and Enso Recovery. Am. Order for Disclosure and Use of Patient Rs. (Docket No. 2:22-mc-00179-KFW, ECF No. 11).

### C.      The Elation Search Warrant

On September 23, 2022, the Government made an *ex parte* application for a warrant authorizing the search and seizure of information such as patient records in Dr. Norris's account with her electronic medical records vendor, Elation Health, Inc. ("**Elation**"). *Franks* Mot. 1–2; Appl. for a Warrant (Docket No. 2:22-mj-00166-KFW, ECF No. 1). SA Wengler submitted an affidavit in support of the application for the search warrant. *See* Aff. in Supp. of Search Warrant ("**Elation Aff.**") (Docket No. 2:22-mj-00166-KFW, ECF Nos. 1, 1-1); Gov't's Hr'g Ex. 17; Def.'s Hr'g Ex. 1. The affidavit contained the following statement:

> On June 16, 2022, the State of Maine Board of Osteopathic Licensure provided a letter to NORRIS notifying her that, after receiving a copy of Walmart's notice letter to NORRIS, it had independently reviewed five patients' records from NORRIS's office. The Board of Osteopathic Licensure determined that three of those five patients were on high doses of methadone, with two on benzodiazepines, without any plan to taper those medications, as part of NORRIS's treatment of their drug dependency. The letter specifically cites that NORRIS may be violating the Board's standards for professional conduct and the Board's rules regarding the use of controlled substances in the treatment of pain.

Elation Aff. ¶ 53.

Judge Wolf issued the warrant (the "**Elation Warrant**") the day it was presented to her, and it was executed that same day, September 23, 2022. *See* Docket No. 2:22-mj-00166-KFW, ECF Nos. 2, 6, 6-1.

### D.    The Indictment

On October 20, 2022, a grand jury returned an indictment charging Dr. Norris with ten counts of distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1) ("**Section 841**"). Indictment 2–3 (ECF No. 3).

### E.    The Practice Warrant

On October 25, 2022, the Government submitted another *ex parte* application for a warrant, this time to authorize the search and seizure of medical records from Dr. Norris's Practice. Appl. for a Warrant (Docket No. 2:22-mj-00198-NT, ECF No. 1). SA Wengler was again the affiant. Aff. in Supp. of Search Warrant (Docket No. 2:22-mj-00198-NT, ECF No. 1-1); *see* Redacted Appl. for a Warrant and Aff. in Supp. of Search Warrant ("**Practice Aff.**") (Docket No. 2:22-mj-00198-NT, ECF No. 10). His affidavit contained the same statement about the June 16, 2022 letter from the Board to Dr. Norris that was used in the affidavit in support of the Elation Warrant. Practice Aff. ¶ 59; Gov't's Hr'g Ex. 18; Def.'s Hr'g Ex. 2. SA Wengler did not mention that the Board had dismissed the complaint against Dr. Norris. SA Wengler did add some additional information to the Practice affidavit, including analysis from the records seized pursuant to the Elation Warrant and an analysis from a new medical expert. *See* Practice Aff. ¶¶ 77–84.

I issued the warrant (the "**Practice Warrant**") on October 25, 2022, and agents executed the warrant the next day. *See* Docket No. 2:22-mj-00198-NT, ECF

Nos. 2, 5. During the execution of the warrant, DI Hinnigan spoke to Strout and learned that the Board had dismissed its complaint against Dr. Norris. Hr'g Tr. Day 2 252:21–252:25, 265:17–266:1.

### F.   Superseding Indictment

On September 7, 2023, the grand jury returned a superseding indictment charging Dr. Norris with seventeen counts of distribution of a controlled substance in violation of Section 841 and 18 U.S.C. § 2. Superseding Indictment 2 (ECF No. 62). The seventeen counts relate to seventeen prescriptions Dr. Norris allegedly wrote for five different patients. *See* Superseding Indictment 2–3.

## PROCEDURAL HISTORY

On September 19, 2023, the Defendant filed her motion to suppress all evidence seized pursuant to and during the execution of the two issued search warrants—the Elation Warrant and the Practice Warrant—and for a *Franks* hearing, alleging that SA Wengler's affidavits contained material false statements and omissions that vitiated probable cause for the warrants. *Franks* Mot. 6. On February 7 and 12, 2024, I held a hearing on the *Franks* motion and other pending motions in the case. Mahan, DI Hinnigan, SA Wengler, Strout, and SSA Pellerin testified. After the hearing, the parties filed supplemental briefing. Gov't Mem. (Post Suppression Hr'g) (ECF No. 144); Def.'s Mem. as to "Franks Hr'g" and Hr'g as to Def.'s Mot. to Suppress for Violation of Def.'s Fourth and Fifth Amendment Rights and Violation of Ct. Order for Disclosure and Use of Patient Rs. and Am. Order ("**Def.'s Post-Hr'g Mem.**") (ECF No. 146).

On January 27, 2024, the Defendant filed a motion to disclose grand jury testimony and materials *in camera* to determine if the Government failed to present to the grand jury evidence of the Board's dismissal that the Defendant believes negated her guilt. Def.'s Mot. for Disclosure *in Camera* of Grand Jury Test. and Materials ("**Mot. for Disclosure**") (ECF No. 122). On April 9, 2024, I held oral argument on the motion for disclosure of grand jury testimony (ECF No. 162).

## LEGAL STANDARD

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment requires a warrant application to contain sufficient information to permit the issuing official to decide whether there is a fair probability that a crime has been committed given the circumstances set forth in the application. *United States v. Barbosa*, 896 F.3d 60, 67 (1st Cir. 2018). "An application supporting a warrant is presumptively valid," but under certain conditions, a defendant can rebut the presumption and challenge the application at a pretrial hearing. *Id.* (internal quotation marks omitted). This is called a *Franks* hearing after the case that established the right to such a hearing—*Franks v. Delaware*, 438 U.S. 154 (1978).

Under *Franks*, "[a] defendant is entitled to a hearing to challenge the truthfulness of statements made in an affidavit supporting a search warrant if [s]he

makes a substantial preliminary showing that (1) a statement in the affidavit was knowingly and intentionally false, or made with reckless disregard of the truth, and (2) the falsehood was necessary to the finding of probable cause." *United States v. Strother*, 318 F.3d 64, 69 (1st Cir. 2003); *see Franks*, 438 U.S. at 171–72.

At the hearing, the defendant must meet an even more exacting standard for the warrant to be voided and the fruits of the search excluded. *United States v. Graf*, 784 F.3d 1, 10–11 (1st Cir. 2015). "[S]he must (1) show that the affiant in fact made a false statement knowingly and intentionally, or with reckless disregard for the truth, (2) make this showing by a preponderance of the evidence, and (3) show in addition that with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *United States v. Tzannos*, 460 F.3d 128, 136 (1st Cir. 2006) (quoting *Franks*, 438 U.S. at 156) (internal quotation marks omitted).

"[A]llegations of . . . negligence or innocent mistake are insufficient . . . [;] [r]ather, the [defendant] must demonstrate that law enforcement officers made statements in the warrant affidavit which amounted to deliberate falsehood or reckless disregard for the truth." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 102 (1st Cir. 2013) (internal citations and quotation marks omitted). "Reckless disregard for the truth may be proven either by evidence that the affiant in fact entertained serious doubts as to the truth of the allegations contained in the affidavit, or by inference from circumstances evincing obvious reasons to doubt the veracity of the allegations." *United States v. Tanguay,* 787 F.3d 44, 52 (1st Cir. 2015) (internal quotation marks

omitted); *see United States v. Arias*, 848 F.3d 504, 511 (1st Cir. 2017); *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002).

Under *Franks*, a defendant may also be entitled to suppression if she makes the requisite showing that information was omitted intentionally or recklessly and that, if included in the affidavit, it would have been "sufficient to vitiate probable cause." *Tanguay*, 787 F.3d at 49. "Recklessness may be inferred directly from the fact of omission only if 'the omitted information was *critical* to the probable cause determination.' " *Id.* "Negligent omissions—even negligent omissions of highly probative information—do not satisfy this strict standard." *Id.* (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 81 (1st Cir. 2005)).

In general, an officer planning to apply for a warrant does not have a duty to investigate fully or "exhaust every possible lead." *Barbosa*, 896 F.3d at 71. However, there is a limited exception if an officer fails to include facts not known to him in a warrant application that could have been discovered by further investigation when there were "obvious reasons" to doubt the truth of the allegations. *Id.*

In looking at probable cause, I must make a "practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place," taking into account the totality of the circumstances. *Tanguay*, 787 F.3d at 50 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). A district court generally gives "great respect to the issuing magistrate's determination of probable cause." *Id.* at 49. "Where relevant information has been withheld from the

magistrate, however, the district court must probe the existence of probable cause anew." *Id.*

## DISCUSSION

### I. Whether the Affiant Made a False Statement or Omitted Information Knowingly and Intentionally or With Reckless Disregard for the Truth

The Defendant contends that SA Wengler: (1) falsely represented that the Board "determined" some of Dr. Norris's patients were on high doses of controlled substances; (2) misleadingly added that there were issues with some patients related to "Norris's treatment of their drug dependency"; (3) omitted that the Board's June 16, 2022 letter was merely a "complaint"; (4) omitted that Dr. Norris had a right to respond to the complaint; (5) omitted that there were limitations regarding the scope of orders for the use and disclosure of patient records and failed to cite the regulations they were issued pursuant to; (6) omitted the fact that Dr. Norris had responded to the Board; and (7) omitted that the Board unanimously dismissed its complaint on October 13, 2022. *Franks* Mot. 6–10; Def.'s Post-Hr'g Mem. 2–9.

#### A. SA Wengler's Characterization of the Board's Letter

I first address the Defendant's concerns with SA Wengler's characterization of the Board's letter. Immediately after the section on Walmart's refusal to fill Dr. Norris's prescriptions, the affidavits contained a section entitled "Board of Osteopathic License" that stated:

> On June 16, 2022, the [Board] provided a letter to NORRIS notifying her that, after receiving a copy of Walmart's notice letter to NORRIS it had independently reviewed five patients' records from NORRIS's office. The [Board] determined that three of those five patients were on high doses of methadone, with two on benzodiazepines, without any plan to taper

13

> those medications, as part of NORRIS's treatment of their drug dependency. The letter specifically cites that NORRIS may be violating the Board's standards for professional conduct and the Board's rules regarding the use of controlled substances in the treatment of pain.

Elation Aff. ¶ 53; Practice Aff. ¶ 59. In contrast, the Board's June 16, 2022 letter stated:

> After receipt of a letter to you from Walmart, the Board subpoenaed five patients' records from you. After review of those records, the Board found concerns with the treatment of three of the patients. All are on high doses of methadone, and two are also on benzodiazepines. Their records do not include a plan to taper these medications, an informed consent document, pill counts, or records that show the PMP is being checked. The records also do not show much patient history. Narcan was prescribed for only one of the three (3) patients.

Gov't Hr'g Ex. 19, at 00001295. The Defendant argues that the affidavits' failure to state that the Board's letter merely noticed a complaint against her and the use of the language "the Board determined" misled the judicial officer reviewing the affidavits into believing that the Board had already made a determination adverse to Dr. Norris.[4]

Further, the affidavits for the two warrants removed the language (seen in the application for the Patient Records Order) that Dr. Norris "was provided with thirty days to respond" and "[t]he Government has not received a copy of that response." *Compare* Gov't Hr'g Ex. 16, *with* Gov't Hr'g Exs. 17 & 18. The omission of this

---

[4]    The Defendant also argues that SA Wengler's gratuitous addition of "as part of NORRIS'S treatment of their drug dependency," was misleading. Def.'s Mot. to Suppress for Violation of Fourth Amendment and for a "Franks" Hr'g 7 (ECF No. 73). The Defendant has not adequately explained how the addition of this language was materially misleading. Given that many of the patients at Graceful Recovery were being treated for substance use disorder, I fail to see how the addition of this language (even if inaccurate) was misleading or damaging to Dr. Norris.

language strengthened the misleading inference that the Board had made a final determination adverse to Dr. Norris.

SA Wengler credibly testified that *he* did not intend to mislead the Court by using the word "determined," but he also testified that the entire investigative team, including the attorneys, were involved in drafting the affidavits and that his job was to review them to ensure accuracy. Hr'g Tr. Day 1 59:21–59:25, 127:18–127:21. He further testified that he could not remember why the language pertaining to Dr. Norris's response was omitted. Hr'g Tr. Day 1 129:1–129:5. SA Wengler testified that he knew he had read Dr. Norris's response at some point, but he had to "move with urgency" and did not have the time to dot every "i" or cross every "t" because of his concerns for the safety of Dr. Norris's patients. Hr'g Tr. Day 1 136:4–136:25.

While the Defendant has not shown by a preponderance of the evidence that paragraph 53 of the Elation Warrant affidavit and paragraph 59 of the Practice Warrant affidavit were worded to intentionally deceive, she has shown by a preponderance that they were worded in reckless disregard for the truth because they strongly suggested that the Board had already made an adverse determination with regard to the three patients mentioned.

### B.     The Omission of the Fact that Dr. Norris Responded to the Board

By the time the Strike Force applied for the Elation Warrant, it possessed Dr. Norris's response to the Board. As discussed above, SA Wengler removed the language that indicated that Dr. Norris had a right to respond to the Board's complaint but said nothing about the fact that Dr. Norris had responded to the complaint. *See* Hr'g Tr. Day 1 76:14–76:25; Hr'g Tr. Day 2 264:9–264:19. The

15

Defendant did not introduce her response as evidence in the *Franks* hearing on this motion to suppress, and she does not argue that SA Wengler omitted specific facts from the response to the Board as a basis for suppression.[5]

As discussed above, SA Wengler testified that he probably had read Dr. Norris's response before he submitted the affidavit in support of the Elation Warrant, but he did not include anything from it because medical experts were warning that patients were at a high risk of overdose deaths and that he needed to move with urgency. He added that, as "a self-serving statement by the defendant," the response had value, but that value was very limited.[6] Hr'g Tr. Day 1 136:4–136:25. I find that SA Wengler did not intend to mislead the judicial officers reviewing the affidavits by omitting the fact that Dr. Norris had filed a response to the Board. At most, the omission was reckless.

### C.    The Omission of the Board's Dismissal of Its Complaint

By the time the Strike Force applied for the Practice Warrant, the Board had already dismissed the complaint against Dr. Norris, but the affidavit in support of the Practice Warrant did not include that fact. SA Wengler credibly testified that he was not aware that the Board had dismissed the complaint when he signed and attested to the truth of the affidavit for the Practice Warrant on October 26, 2022. *See* Hr'g Tr. Day 1 94:10–94:13, 103:18–104:3, 125:7–125:13.

---

[5]    Dr. Norris's response to the Board was submitted as an exhibit in support of the Defendant's motion for disclosure of grand jury testimony and materials. *See* Def.'s Mot. Reply to Gov't Resp. in Opp'n Mot. for Disclosure *in Camera* of Grand Jury Test. and Materials Ex. 4 (ECF No. 153-4).

[6]    Because Dr. Norris's response is not in the record on this motion, I do not independently assess its veracity or value.

DI Hinnigan, who was responsible for getting updates from the Board, testified that she was unaware of the dismissal and only found out about it on October 26, 2022, when the Practice Warrant was executed. Hr'g Tr. Day 2 197:19–197:23, 233:5–233:8, 252:24–252:25, 265:6–266:1. DI Hinnigan stated that she was shocked that the Board had made a decision so quickly after receiving Dr. Norris's response because in her experience, it normally took "many months, if not over six months" to reach the adjudication phase. Hr'g Tr. Day 1 245:12–245:21, 253:24–254:5, 266:20–267:10. But the Board began its investigation by subpoenaing Dr. Norris's patient files on December 29, 2021, and it initiated its complaint on February 10, 2022. The Strike Force was aware of how long the matter had been open because it received the file on the Board's investigation of Dr. Norris. The Strike Force also had a copy of the "Notice to Complainants and Licensees" that Dr. Norris received from the Board, which states that complaints are usually presented to the Board the second Thursday of every month and that agendas are posted the Friday before the meeting. The Strike Force members knew that Dr. Norris had responded to the Board in September, and they knew that the Board would be issuing a decision. By the time of the October 13, 2022 Board hearing, the Board's complaint had been pending for over nine months. And DI Hinnigan had been in touch with the Board's executive director ten times over the summer. It would have taken little time or effort to check on the status of the Board's complaint.

While the failure to follow every possible lead usually amounts, at most, to negligence, here the Board's proceeding was a significant part of the evidence

17

contained in the affidavit.[7] I therefore find that the Defendant has established that the Strike Force showed reckless disregard for the truth by failing to ascertain that the Board had dismissed the complaint against Dr. Norris before they applied for the Practice Warrant.

## II. Whether, Had the Affidavits Made Clear That the Board Had Dismissed the Complaint, the Warrant Applications Still Would Have Met the Probable Cause Standard

Having determined that the Defendant has met her burden of showing that the agents misleadingly described the Board's proceeding, and recklessly omitted that Dr. Norris had responded and the Board had dismissed the complaint against Dr. Norris, I must next assess whether—had that information been included in the affidavits—it would have vitiated probable cause.

### A. The Elation Warrant

The portion of the affidavit for the Elation Warrant that specifically discusses whether there was probable cause to believe that Dr. Norris illegally distributed controlled substances or engaged in health care fraud spans seven pages. Elation Aff. ¶¶ 44–75. In it, in addition to the section on the Board's complaint, SA Wengler: analyzes Medicare claims data; discusses the investigation that generated Walmart's decision not to fill Dr. Norris's prescriptions; summarizes medical expert Dr. Donald Sullivan's analysis of Dr. Norris's prescribing practices; provides information about the number of Medicare and Medicaid patient deaths; and summarizes a Uniform

---

[7]     The Board's determination was pertinent to more than its own investigation. Because the Board's investigation began with the Walmart letter, the Board's dismissal of its complaint against Dr. Norris also cast doubt on the Walmart investigation.

Program Integrity Contractor ("**UPIC**") review and analysis of Dr. Norris's claims and patient files.

According to SA Wengler's analysis of Dr. Norris's Medicare claims, she falls in the 99th percentile nationally for the total MMEs prescribed per patient and the 95th percentile for prescribing patients both an opioid and a benzodiazepine.[8] Elation Aff. ¶¶ 46–49. And SA Wengler avers that opiates and benzodiazepines are a "well-known combination of controlled substances . . . commonly abused and/or diverted by patients."[9] Elation Aff. ¶ 49. The Medicare data also indicated that Dr. Norris wrote prescriptions to 185 patients with whom she did not have any previous Medicare claims for treatment, which suggested that Dr. Norris did not have a prior doctor-patient relationship with those patients, a red flag indicative of illegal prescribing practices. Elation Aff. ¶ 48.

SA Wengler described the Walmart investigation that resulted in the decision to block Walmart pharmacies from filling prescriptions by Dr. Norris. Elation Aff. ¶¶ 50–52. Walmart looked at Dr. Norris's prescribing practices from October 2020 to October 2021 and identified "a number of 'Red Flags' in NORRIS's prescribing practices, including, among others: evidence of 'pharmacy shopping' (that is, one patient traveling to multiple pharmacies to fill prescriptions); total number or

---

[8]       The affidavit does not say the time period covered by this data.

[9]       He further explained that "[o]n August 31, 2016, the Food and Drug Administration ("**FDA**") issued notice about the danger of concurrent opioid and benzodiazepine prescribing." Elation Aff. ¶ 14. The FDA notice explained that concurrent use could result in coma or death and cited a study finding that patients are at ten times higher risk of overdose death through concurrent use. Elation Aff. ¶ 14. The FDA "strongly warns" doctors to limit concurrent prescriptions, dosages, and duration of each drug to the "minimum possible." Elation Aff. ¶ 14.

percentage of controlled substances prescribed; patients insisting on paying for their prescription refills with cash; unusually large quantity or high starting dose for the prescription; and providing the same diagnosis for a majority of her patients." Elation Aff. ¶ 51. According to Walmart's investigation, Dr. Norris prescribed the average patient 174 MMEs per day, in excess of the 90 MME threshold contained within guidance from the Centers for Disease Control and Prevention. Elation Aff. ¶ 52.

SA Wengler's affidavit also contained the opinions of Dr. Donald Sullivan, a Professor of Pharmacy Practice and Science and Clinical Pharmacy at Ohio State University. Elation Aff. ¶¶ 54–60. Dr. Sullivan reviewed Dr. Norris's prescribing patterns from May 2020 to May 2022 and concluded that she wrote thousands of prescriptions for narcotic pain killers, benzodiazepines, and stimulants that were not for a legitimate medical purpose. Elation Aff. ¶¶ 55–56. Dr. Sullivan took issue with Dr. Norris's prescribing oxycodone in combination with methadone and prescribing narcotic pain killers in combination with benzodiazepines, which in his opinion put patients at significantly higher risk of overdose. Elation Aff. ¶ 57. Dr. Sullivan determined that twenty-four patients were prescribed two narcotic painkillers and a benzodiazepine at the same time. Elation Aff. ¶ 59. Dr. Sullivan focused specifically on three patients. Patient #1 had been prescribed both methadone and hydromorphone, with a total MME of 1200–1360. Patient #2 had been prescribed methadone and oxycodone, with a total MME of 1500–1740. Patient #3 had been prescribed fentanyl and two forms of hydromorphone, with a total MME of 1664.

According to Dr. Sullivan, the prescriptions put all three patients at "imminent risk for an overdose." Elation Aff. ¶ 58.

With regard to patient deaths, SA Wengler stated that Medicaid data indicated that between January 2018 and June 2022, twenty-two of Dr. Norris's patients had died, and the average age was roughly 49 years old. Elation Aff. ¶ 61. Nine Medicare patients also died during that time frame with an average age of 68 years old. Elation Aff. ¶ 61. Incident and medical examiner reports of at least eight patients of Dr. Norris reflect that the primary cause of their deaths was determined to be overdose. Elation Aff. ¶ 62.

Finally, SA Wengler summarized the 2021–2022 UPIC investigation wherein a retained medical consultant analyzed patient files for eleven of Dr. Norris's patients with the highest MMEs and the most flagged criteria. Elation Aff. ¶¶ 63–68. The consultant opined that the allegation of opioid over-prescribing and prescribing opioids while not medically necessary was "well-founded."

Given that there were multiple investigations into Dr. Norris's prescribing practices (Walmart, the Board, UPIC, and the Strike Force) and multiple opinions from medical consultants stating that a number of her prescriptions were not medically necessary and were contraindicated, the Defendant has not met her burden of proving that probable cause would have been vitiated if the magistrate judge had known that the Board was only at the complaint stage and that Dr. Norris had responded to the Board. Given all the circumstances set forth in the Elation affidavit and adding to it the facts that the Board proceeding was only at the complaint stage

and that Dr. Norris had filed a response to the Board, I find that the affidavit still establishes that there is a fair probability that Dr. Norris was distributing controlled substances outside the usual course of professional practice without legitimate medical need and that there was probable cause to believe that evidence of that violation would be found at the places identified in the Elation Warrant.

### B.    The Practice Warrant

With regard to the Practice Warrant, I consider probable cause anew, this time assessing the affidavit along with the fact that Dr. Norris had responded *and* that the Board had unanimously dismissed the complaint against her with thanks for the thorough and compassionate care she was providing to patients.

The affidavit in support of the Practice Warrant included the same facts as summarized above. In addition, SA Wengler averred that:

- Medicaid and Medicare data reflected that Dr. Norris prescribed controlled substances to multiple patients who died of overdoses within forty-five days of receiving a controlled substance prescription from Dr. Norris. Practice Aff. ¶ 70.

- Investigators reviewed patient files taken during the Elation Warrant and found that Dr. Norris was prescribing dangerously high amounts of controlled substances to patients who had a documented history of diverting or abusing controlled substances. Practice Aff. ¶¶ 78–79.

- Dr. Shonali Saha, a second expert retained by the Government, reviewed Dr. Norris's electronic medical records as well as prescription monitoring program data for select patients and determined that for three additional patients (A, B and C), Dr. Norris was issuing prescriptions that were outside the usual course of professional practice and not for a legitimate medical purpose. Practice Aff. ¶¶ 81–84.

Whether the omitted material—the fact that Dr. Norris had responded to the Board's complaint and the Board then dismissed the complaint—vitiates probable

cause for the Practice Warrant is a closer question. The Board itself indicated that it had conducted "a thorough review" and that it had "voted unanimously to dismiss the complaint as it did not rise to a level which would warrant further review or action against your license." *See Franks* Mot. Ex. 3, at 86; Gov't's Hr'g Ex. 20. SA Wengler testified that in his experience, boards in this jurisdiction typically do a cursory review.[10] And DI Hinnigan implied that the Board had rushed to judgment.[11] I question the testimony of the agents in this regard and give this testimony no weight.

But the Board was looking at a limited number of patient records, whereas the scope of the Strike Force's investigation was considerably broader. *See* Gov't's Hr'g Ex. 16 ¶¶ 4–19; Practice Aff. ¶¶ 52–84. For example, the Board subpoena in the record only asked for patient records from July 1, 2021 to December 15, 2021, whereas the Practice Warrant affidavit alleged that there was probable cause to believe that from January 1, 2019 to the fall of 2022, Dr. Norris was violating Section 841. *See* Board Subpoena; Practice Aff. ¶ 85. And two medical experts (Dr. Sullivan and Dr. Saha) opined that in specific cases, Dr. Norris had prescribed drugs that were not for legitimate medical purposes. I have no basis on which to discredit their opinions.

I am aware that in the last twenty years, viewpoints have shifted both on the treatment of substance use disorder and on the use of opioids to manage pain. These

---

[10]     SA Wengler noted that boards "typically will get a complaint. They will do a little bit of research on it. Usually the boards are understaffed. They do not have the ability to conduct the type of law enforcement investigative review that we do. And typically they tend [to] find for their . . . members." *Franks* Hr'g Tr. Day 1 124:25–125:4.

[11]     DI Hinnigan testified: "It is shocking to me that a decision [by the Board] would have been rendered prior to the search warrant." *Franks* Hr'g Tr. Day 2 245:13–245:14.

areas of medicine are not without controversy. But my review is limited, and the probable cause standard is not a particularly onerous burden. Given all the circumstances set forth in the Practice Warrant affidavit and adding to it that Dr. Norris had filed a response which convinced the Board to dismiss its complaint, I find that the affidavit still establishes that there is a fair probability that Dr. Norris was distributing controlled substances outside the usual course of professional practice without legitimate medical need and that there was probable cause to believe that evidence of that violation would be found at the places identified in the Practice Warrant.

## III. Whether the Defendant Is Entitled to Disclosure of Grand Jury Testimony and Materials

The Defendant also seeks the disclosure of grand jury testimony and materials. The Government turned over SA Wengler's grand jury testimony to the Defendant before the suppression hearing. Because the transcripts of his testimony do not contain any statements about the Board's dismissal, the Defendant wants to determine if the Government failed to present any evidence to the grand jury that the Board dismissed the complaint against her. Mot. for Disclosure 2, 6.

The Defendant also identifies what she labels as additional misstatements in SA Wengler's testimony. SA Wengler gave the following testimony to the grand jury on October 20, 2022:

> Q: Okay. And so if -- what did the Board of Osteopathic Licensure do as a result of receiving th[e Walmart] complaint?
> A: So they -- they also reviewed five files, looked at her prescribing history, and also noted some red flags in terms of her prescribing.
> Q: And if you can recall, what were some of those red flags?

A. High doses. They also indicated to her that she may be violating the standard of professional conduct of the board.

Q. And did they have -- did the patient records support the prescribing as presented to the osteopathic board?

A. Yes.

Q. Did the patient files that -- from Dr. Norris support the -- let me rephrase that. Was the prescribing supported by the documentation in the patient files?

A. No.

Q. And that was a red flag for the board?

A. Yes. There was limited documentation. I think the board also noted that there was no plans to taper some of the patients off of these medications that they were on.

Q. And did they also note that she was, again, prescribing high doses of the opioid and also the opioid and benzodiazepines?

A: Yes.

Q: Okay. So what did the board do when they -- did they receive a response from Dr. Norris?

A: What did they do?

Q: When they had the complaint, did this receive a response from Dr. Norris?

A: Sorry. I'm not sure if I'm following you.

Q: Sure. Let me rephrase it. When the Board of Osteopathic Licensure did their investigation -- right --

A: Right.

Q. -- they made a request to Dr. Norris for those patient files, correct?

A: Correct.

Q: And then they made these findings that you just talked about?

A: Correct.

Q: And then after that, did Dr. Norris respond to their findings?

A: I don't -- I don't recall.

Q: Okay. So on approximately September 1st, 2022, if Dr. Norris submitted -- do you recall that she submitted a response to the Board of Osteopathic Board Licensure about the prescribing that they had been concerned about?

A. Yes.

Q. And in that letter, did she acknowledge that there was high prescribing and provide any sort of reasoning for it?

A. No, not that I recall.

Def.'s Mot. Reply to Gov't's Resp. in Opp'n Mot. for Disclosure *in Camera* of Grand

Jury Test. And Materials ("**Def.'s Disclosure Mot. Reply**") 4–5 (ECF No. 153) & Ex.

2, at 27:10–29:19 (ECF No. 153-2).

The Defendant argued in her motion and at oral argument that SA Wengler's testimony was false because he: (1) did not mention the Board's dismissal; (2) testified that the Board made "findings"; (3) testified that Dr. Norris's prescribing was not supported by the documentation in the patient files; and (4) testified that she did not respond to the Board's complaint when her response discussed her prescribing practices at length. *See* Def.'s Disclosure Mot. Reply 4–5 & Ex. 4. When SA Wengler testified before the grand jury again on September 7, 2023, the Government introduced his testimony from the first grand jury but did not update it with information about Dr. Norris's detailed response or the Board's dismissal. Def.'s Disclosure Mot. Reply Ex. 3(ECF No. 153-3).

Rule 6 of the Federal Rules of Criminal Procedure prohibits government attorneys from disclosing information or evidence related to "a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B)(vi). However, a court can authorize disclosure "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).

"Rule 6 does not itself define when an indictment may be dismissed due to 'a matter that occurred before the grand jury.' But those circumstances are very rare." *In re United States*, 441 F.3d 44, 60 (1st Cir. 2006) (quoting Fed. R. Crim. P. 6). "Generally, a court, under its supervisory powers, will dismiss an indictment if there has been prosecutorial misconduct that actually biases the grand jury in performing its fact-finding function." *United States v. Maceo*, 873 F.2d 1, 3 (1st Cir. 1989).

Dismissal is appropriate " 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *United States v. Reyes-Echevarría*, 345 F.3d 1, 4 (2003) (quoting *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254 (1988)). But failing to disclose "substantial exculpatory evidence" to the grand jury that the prosecution has in its possession is not a ground for dismissal. *United States v. Williams*, 504 U.S. 36, 45–47 (1992). And courts will not dismiss an indictment if there is other competent and material evidence to sustain the charge issued. *See Reyes-Echevarría*, 345 F.3d at 5; *Maceo*, 873 F.2d at 4.

The Defendant's characterization of SA Wengler's testimony as false is exaggerated. First, SA Wengler did not deny that Dr. Norris had responded to the Board. He was clearly confused about the line of questioning regarding Dr. Norris's response, but he ultimately recalled that she had responded to the Board. And when he was asked the compound question of whether Dr. Norris acknowledged "that there was high prescribing and provide[d] any sort of reasoning for it," he ambiguously responded: "No, *not that I recall*." SA Wengler's testimony is neither a statement that Dr. Norris did not respond to the Board's complaint nor a statement that she did not provide any reasoning. Read in context, SA Wengler acknowledged that Dr. Norris responded to the Board, but he did not recall that she either acknowledged high prescribing or provided reasons for it. Second, SA Wengler did not use the term "findings" when he testified about the Board's June 16th letter. The term "findings"

was in the prosecutor's question, not SA Wengler's answer. And the question referring to the Board's "findings" closely matches the language in the Board's letter that "the Board *found* concerns with the treatment of three of the patients." Gov't's Hr'g Ex. 19, at 00001295 (emphasis added). So, this characterization clearly cannot constitute prosecutorial misconduct. Third, I do not see the falsity in SA Wengler's testimony that one of the red flags for the Board was that Dr. Norris's prescribing was not supported by the documentation in the patient files. The Board expressed concern that the records "d[id] not include a plan to taper these medications, an informed consent document, [or] pill counts," and did not "show the PMP is being checked" or "much patient history." Gov't's Hr'g Ex. 19, at 00001295.

Furthermore, assuming that the Government did fail to provide the grand jury either with Dr. Norris's response to the Board or with the fact that the Board dismissed its complaint, those omissions would amount to a failure to present exculpatory evidence. They are not acts of prosecutorial misconduct that might warrant dismissal. *See Williams*, 504 U.S. at 53 ("If the grand jury has no obligation to consider all 'substantial exculpatory' evidence, we do not understand how the prosecutor can be said to have a binding obligation to present it.").

Finally, even if I did find that the testimony identified by the Defendant contained misstatements, there would still be no basis to dismiss the indictment here. As discussed in detail above, even without this information, there was still other competent and material evidence to support a finding of probable cause.

28

In summary, because the Defendant has not established prosecutorial misconduct that substantially influenced the grand jury's decision to indict and because there was otherwise sufficient material evidence for the grand jury to find probable cause, this is not an appropriate case for disclosing evidence regarding what occurred before the grand jury.

## CONCLUSION

For the reasons stated above, the Defendant's motion to suppress (ECF No. 73) is **DENIED** and the Defendant's motion to disclose grand jury testimony and materials (ECF No. 122) is **DENIED**.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 26th day of April, 2024.