# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:22-cr-132-NT |
| | ) | |
| MERIDETH C. NORRIS, D.O. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States, by and through Department of Justice Trial Attorneys, Danielle H. Sakowski and Thomas D. Campbell, hereby respectfully submits this sentencing memorandum to assist the Court in determining the Defendant's sentencing guidelines calculation.  On June 21, 2024, a jury found defendant Merideth C. Norris, D.O., guilty of 15 counts of unlawful distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1).  On October 23, 2024, the U.S. Probation Office issued its Final Presentence Report ("PSR").  [ECF 318].  The PSR calculates Defendant's Offense Level as 12 and Criminal History Category as I.  PSR ¶¶ 24 & 27.

 For the reasons articulated below, the government respectfully requests that the Court adopt the findings of the PSR.  Based upon the above Offense Level and Criminal History Category, the Defendant's guidelines range is 10–16 months.  The government submits that a sentence of 16 months' imprisonment, followed by three years of supervised release, is sufficient, but not greater than necessary, to provide just punishment in this case, promote respect for the law, and both general and specific deterrence.[1]

## BACKGROUND

### I.      Procedural History

---

[1] A three-year term of supervised release is required following any term of incarceration for this offense. *See* 21 U.S.C. § 841(b)(1)(C).

On September 7, 2023, a federal grand jury in Portland, Maine, returned a Superseding Indictment, charging the Defendant with seventeen counts of illegally distributing controlled substances, including opioids, stimulants, and benzodiazepines, outside of the usual course of her professional practice and without a legitimate medical purpose in violation of Title 21, United States Code, Section 841(a)(1).  [ECF No. 62].

On June 6, 2024, the Government moved to dismiss Count Ten of the Superseding Indictment, which charged the Defendant with illegally distributing fentanyl to Patient 3 on the same date as Count Eleven.  The Court granted the motion.  [ECF No. 244].

On June 10, 2024, trial commenced in this case.  [ECF No. 257].  On June 21, 2024, the jury returned a verdict of guilty on 15 of the 16 remaining counts. [ECF 286].  Sentencing is scheduled for May 15, 2025.  [ECF 323].

## II.    Evidence Presented at Trial

The Defendant, a licensed Doctor of Osteopathic Medicine in the State of Maine, operated a solo primary care and pain management practice in Kennebunk, Maine, where she prescribed controlled drugs, including opioids (methadone, oxycodone, fentanyl, and hydromorphone), benzodiazepines (clonazepam and diazepam), and stimulants (dextroamphetamine-amphetamine). The Defendant prescribed these drugs in high doses and often in combination.  Many of the Defendant's patients had documented histories of substance abuse and were often still abusing drugs and alcohol at the time that the Defendant prescribed these drugs.  The Defendant repeatedly prescribed at these dosages and in these combinations even when patients failed to improve or respond to the drugs.  Evidence at trial established that the Defendant, through her prescribing, facilitated addiction and ignored warnings, including from a pharmacist, Walmart, an insurance company, the State of Maine's Prescription Monitoring Program, and members of the community,

2

as to the danger posed by her prescribing.

### III.    The Defendant's Objections to the PSR are Without Merit

The Defendant makes several objections to the PSR, none of which have any bearing on the total offense level.  All of the Defendant's objections are without merit.

Consistent with the calculation set forth in the PSR, the government submits that the total offense level for the Defendant should be calculated as Level 12, pursuant to U.S.S.G. §2D1.1(c)(5).  This calculation is based on the Defendant's convictions for unlawfully prescribing 574 pills of methadone (10 mg per pill), 28 pills of oxycodone (5 mg per pill), 14 pills of dextroamphetamine-amphetamine (20 mg per pill), 21 pills of clonazepam (.05 mg per pill), 84 pills of diazepam (10 mg per pill), 15 fentanyl patches (75 mcg per pill), and 63 pills of hydromorphone (4 mg per pill) to the patients identified in the Superseding Indictment.  The total offense level also contemplates the Abuse of Trust enhancement based on the Defendant's use of a special skill, namely her medical training and license, in dispensing these drugs.

The Defendant does not contest the underlying facts alleged in the PSR as to drug quantity, nor the application of the Abuse of Trust enhancement.  Instead, the Defendant objects to the application of the United States Sentencing Guidelines at all, as well as the appropriateness of "the conclusions reached based on the recited evidence" in PSR ¶¶ 6–9.  [ECF 317 at 1].

The Defendant's objections to the application of the Guidelines offer passing conclusory cites to *United States v. Booker,* 43 U.S. 220 (2005) and *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), but fail to develop either into an argument that the government can parse or offer a specific response to.  No party to this sentencing is arguing, contrary to *Booker*, that the Guidelines are binding upon this Court.  The Guidelines do, however, serve an important and necessary purpose in helping this Court arrive at a sentence that is sufficient, but not greater than

necessary, to provide just punishment in this case, promote respect for the law, and both general and specific deterrence.

The Introduction to the United States Sentencing Guidelines notes that Congress, in enacting the Sentencing Reform Act of 1984, "sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." U.S.S.G. § 1A1.1, Introductory cmt. (n.3). The First Circuit has cautioned that "just because a sentencing court possesses the raw power to deviate from the guidelines does not mean that it can (or should) do so casually." *United States v. Rivera-Berrios*, 968 F.3d 130, 134 (1st Cir. 2020) (citation omitted). Indeed, one of the central reasons for creating the sentencing guidelines was "to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Musgraves*, 761 F.3d 602, 609 (6th Cir. 2014). 21 U.S.C. § 841(a)(1) is not a statute specifically designed to charge a violation of a medical provider's duties. Many defendants charged with violating Section 841(a)(1) are what might be considered "street-level offenders," those people illegally distributing controlled substances who do not have the kinds of privileges and opportunities that the Defendant had by way of her medical background. The Defendant should be treated no differently than any other defendant convicted of illegally distributing controlled drugs.

As to the passing reference to the holding in *Loper Bright*, since that decision was handed down last year, defendants have largely raised it in the context of a sentencing court interpreting commentary to the Guidelines. In *Stinson v. United States,* 508 U.S. 36, 45 (1992), the Supreme Court held that the Guidelines' commentary "is akin to an agency's interpretation of its own legislative rules." "*Loper Bright* struck down *Chevron* deference which required courts to defer to an agency's permissible construction of an ambiguous statute. *Loper Bright* said nothing about

4

deference to an agency interpretation of a regulation." *United States v. Alqsous*, 2025 U.S. Dist. LEXIS 53549, at 74 (N.D. OH Mar. 24, 2025). Following *Stinson*, "courts have applied *Kisor v. Wilkie*, 588 U.S. 558 (2019) to determine whether to defer to the commentary's interpretation of a Sentencing Guideline." *Id.* Since *Loper Bright*, courts have continued employing *Kisor* to guide them in consideration of Sentencing Guidelines' commentary. *Id.*

Here, the Defendant makes no specific or developed argument relative to *Loper Bright*, leaving the government to guess as to her potential objections based on it. To the extent the Defendant is raising it in the context of commentary interpretation, *Alqsous*, and the cases it cites, reject *Loper Bright* as having altered that landscape. Furthermore, within this case, the Defendant's Guidelines stem entirely from the drug weight making up the convicted counts and the Abuse of Trust enhancement. Neither the PSR nor the government put forth a recommended guideline range based on the Guidelines' commentary. The Court therefore need not consider any argument under *Loper Bright* that it should not give deference to the Sentencing Commission commentary in interpreting the Guidelines. Sentencing in this case does not concern the commentary, but the Guidelines themselves, which are adopted by Congress.

The Defendant also generally objects to the facts contained in the PSR insofar as those facts led the jury to convict. The government understands from the Defendant's Objection to the PSR, that this objection is to preserve appellate rights, not that the Defendant contests the facts that were elicited and presented at trial as relayed in the PSR.

## IV.    Analysis of the Section 3553(a) Factors

The federal statute governing sentencing requires district courts to take the applicable Sentencing Guidelines range into consideration when sentencing, along with other sentencing factors enumerated by Congress. *See* 18 U.S.C. § 3553; *Booker*, 543 U.S. 220, at 264 ("The district

courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). When the Court determines a sentence, "the Guidelines are the starting point and the initial benchmark." *United States v. Julien* 2008 U.S. Dist. LEXIS 36390 at 2 (D. Me. May 5, 2008).

Once the Court calculates the Defendant's Sentencing Guidelines range, it must then consider the factors set forth in 18 U.S.C. § 3553(a) to decide if they support the sentence recommended by the parties. These factors include, among others: (a) the nature and circumstances of a defendant's offense and her history and characteristics; and (b) the need for the sentence contemplated to, among other things: (i) reflect the seriousness of the offense; (ii) promote respect for the law and provide just punishment for the offense; (iii) afford adequate deterrence to criminal conduct; and (iv) protect the public from further crimes of the defendant.

The Section 3553(a) factors support a sentence of 16 months in custody for the Defendant. Such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a), discussed further below.

### A. Nature and Circumstance of the Offenses

The Defendant's decision to prescribe in a manner that ignored national and local prescribing guidelines, provided addictive and dangerous drugs to patients for whom the drugs were not working, and which further facilitated addiction, is a serious offense. As a practitioner in Maine—a state in which, between 2021 and 2022, according to data compiled by the Maine Office of the Attorney General and the Office of Behavioral Health, 1,347 Mainers[2] died from drug overdoses—the Defendant was well aware of the risks of prescribing dangerous drugs outside the usual course of professional practice. Additionally, before and at the time that the Defendant

---

[2] "Maine Monthly Overdose Report" (https://mainedrugdata.org/wp-content/uploads/2023/01/2022-12-ME_Monthly_OD_Report_final.pdf) (last accessed April 29, 2025).

was illegally distributing these drugs to patients, she worked as the clinical director for several methadone clinics in Maine, further heightening her awareness of the dangers of the drugs she was readily prescribing to patients with documented substance-use disorders.

The Government's expert, Dr. Timothy King, testified that as part of his review of patient files in this case he reviewed State of Maine regulations regarding the use of controlled substances in the context of pain management. [Transcript at 473]. Dr. King also testified that the State of Maine, along with other states, had set a "benchmark of a hundred morphine equivalents . . . as a . . . thou shall not going beyond this number without a firm foundation," to which there are some exceptions, such as "patients with end-stage cancer." [Transcript at 530–31]. Additionally, he testified that the usual course of professional practice of pain medicine is "very consistent throughout the states and the country" and that the "legitimate use of controlled substances and the treatment of chronic pain are consistent throughout the country and the various states." [Transcript at 1027].

Dr. King testified further that none of the prescriptions written by the Defendant which he reviewed were within the usual course of professional practice for a practitioner in the State of Maine, nor were any of the prescriptions written for a legitimate medical purpose as recognized by the State of Maine. [Transcript at 1027–28]. As Dr. King testified, the State of Maine required that providers prescribe less than 100 MMEs unless a patient fell within a specific exemption category. [Transcript at 530].

That the Defendant practiced medicine on a patient population with unfortunate life circumstances, who may not have had access to every resource, does not alter the ordinary course of professional practice. Defense counsel attempted to establish a different standard for the Defendant on numerous occasions during their cross examination of Dr. King to no avail. When

repeatedly asked what would have been appropriate for these patients in the absence of an inpatient bed, a multidisciplinary clinic, *et cetera*, Dr. King answered, "it's very clear that *at the very least* this patient needs to be stopped being triggered with the opioids they're being prescribed." [Transcript at 816 (emphasis added)]. Evidence at trial established that the Defendant continued to prescribe addictive and dangerous controlled substances to patients who were in the active throes of addiction to various substances. [Transcript at 688; 816; 817; 819; 1031; 1033; 1034; 1052; 1054; 1055].

The Defendant knew, and was put on notice numerous times, that her prescribing was illegal and dangerous. At trial, Lori McKeown, a Staff Pharmacist at the Walmart Pharmacy in Biddeford, Maine testified regarding Patient 2, as he was a patient at her pharmacy and she "had many conversations with him." [Transcript at 164]. In February 2020, Ms. McKeown received a prescription for oxycodone for Patient 2 from the Defendant. [Transcript at 165]. Ms. McKeown refused to fill the prescription, because there were "red flags that [she] couldn't resolve." [Transcript at 166]. The prescription was for a high dose of oxycodone. [Transcript at 166]. She knew from speaking with Patient 2 that he had been addicted to medications and had been in recovery for three years at the time that the prescription was written. [Transcript at 169]. The oxycodone prescription was prescribed for dental pain, but Ms. McKeown knew that the Defendant was not a dentist. [Transcript at 169]. Ms. McKeown called the Defendant's practice to say that she would not be filling the prescription. [Transcript at 170].

Over a year and a half later, in October 2021, Ms. McKeown again received a prescription for oxycodone from the Defendant for Patient 2. [Transcript at 171]. Again, the prescription was issued at a high dose. [Transcript at 171]. Again, the prescription was for dental pain. [Transcript at 171–72]. By this time, the Walmart Pharmacy in Biddeford had informed the Defendant's

practice that pharmacists at that pharmacy would no longer fill any prescriptions for acute dental pain written by the Defendant. [Transcript at 172]. Ms. McKeown knew that Patient 2, "who had a history of addiction," had been receiving "acute pain medications" for over a year and a half, and she "was concerned for his safety." [Transcript at 173]. Ms. McKeown therefore refused to fill the prescription and entered a blanket refusal to fill, meaning that she would no longer fill any prescriptions written by the Defendant; the only time that she has done so in her over thirty years' experience as a pharmacist. [Transcript at 173–74]. Following these refusals, Walmart issued a central block on the Defendant, refusing to fill any prescription for a controlled drug written by her. [GX 301].

The Defendant treated Patient 1 from June 2019 until approximately June of 2022. [GX 101 at 15; 413]. Patient 1 presented at his initial appointment, as documented in the Defendant's patient file, with a series of red flags, including a history of substance abuse and unresolved mental health issues. [GX 101 at 15]. Prior to the issuance of the methadone prescription at Count 1, the Defendant received at least eight letters from OptumRx flagging potential safety concerns with her prescribing. [GX 101 at 85, 101, 162–64, 165–67, 169–72, 181–84, 195–206, 211–13].

Patient 1 never had a consistent urine drug screen while treating with the Defendant and consistently exhibited a declining quality of life—he was on disability, dealt with homelessness, and had relationship issues. [GX 101 at 39, 49, 58, 150, 180, 186, 216, 290, 312, 327, 392]. In addition to the inconsistent urine drug screens, Patient 1 also admitted to numerous relapses prior to the issuance of these prescriptions, including a disclosure on August 3, 2020, in which he admitted to using cocaine and thought there might have been meth (presumably methamphetamine) in it, and on January 25, 2021, when he admitted to having a social relapse around Christmas. [GX 101 at 195, 269]. On January 23, 2021, a case worker who had conducted

9

a home visit when Patient 1 was present, reported to the Defendant that Patient 1 appeared altered, had an unsteady gait, and was nodding. [GX 101 at 262]. The Defendant reported to the case worker that Patient 1's "tox screens" had been fine for over a year—a fact that is unsupported by any of the urine drug test results in Patient 1's files. *Id*. On February 3, 2022, Patient 1 disclosed to the Defendant that he had used "a few lines of dope." [GX 101 at 358].

The Defendant began prescribing benzodiazepines to Patient 1 in 2019, in what appeared to be an effort to transition Patient 1 from unprescribed, street-sourced benzodiazepines to prescribed benzodiazepines. [GX 101 at 72]. The Defendant noted that Patient 1 "was positive for benzodiazepines which is obviously not safe in the presence of methadone." [GX 101 at 39]. Despite that note, the Defendant prescribed Patient 1 benzodiazepines. The Defendant did this despite documenting the risks associated with concurrent opioid and benzodiazepine use. [GX 101 at 39]. As detailed above, Patient 1 did not improve on this medication regimen and generally had a degraded quality of life. OptumRx continuously flagged the potential danger for the Defendant, while Patient 1 continued to fail urine drug tests and admitted to numerous relapses on street drugs.

Additionally, the Defendant intentionally withheld documents related to her treatment of Patient 1, when they were requested by a regulating body. On December 29, 2021, the Maine Board of Osteopathic Medicine requested that the Defendant provide six months of patient records (from July 1 to December 15, 2021) for five patients, including Patient 1. [GX 604]. The patient records produced to the Board did not include the complete medical record as requested. [GX 604 at 1]. Specifically, the disclosed records did not include an internal communication in which the Defendant told her staff that Patient 1's inconsistent drug tests results were "putting [the Defendant] in a TERRIBLE position." [GX 603 at 23 (emphasis in original)]. They did not

10

include multiple notices from OptumRx, informing the Defendant that her prescriptions to Patient 1 had been flagged as having potential clinical concerns due to potential pharmacy shopping, prescribing high opioid doses, and prescribing opioids in combination with benzodiazepines. [GX 603 at 8, 30–32].

The removal of the OptumRx letter flagging pharmacy shopping is significant in light of the Defendant's response to the Board, in which she made multiple misrepresentations. [GX 601]. In that response, the Defendant told the Board that she checked for one pharmacy being used to ensure that patients are compliant with their medication. [*Id*. at 3]. The OptumRx letter flagging this issue with Patient 1, which fell within the timeframe of records requested by the Board, would have alerted the Board to the fact that the Defendant knew that Patient 1 was pharmacy shopping, but that the Defendant continued prescribing.

In her response to the Board, the Defendant also told the Board that she used urine drug tests for all of her patients and would stop prescribing after repeat violations. [*Id*. at 4]. Patient 1's patient file contained only inconsistent drug screens, meaning that Patient 1 tested negative for prescribed controlled substances or tested positive for unprescribed controlled substances during every screen conducted by the Defendant. Despite this, he remained a patient for several years. [GX 101 at 31–34. 41–45, 50–54, 63–67, 75–79, 107–11, 140–44, 196–200, 238–42, 257–59, 333–38, 364–75, 395–406]. The Board did not have information to confirm or dispel this assertion when they dismissed the complaint. The Defendant also suggested to the Board that Patient 1 was a legacy patient. [GX 601 at 1]. That also is not true, as Patient 1 had not previously been prescribed methadone, which the Board had identified as one of its principal concerns. [Transcript at 584].

Patient 2 was known to the Defendant and presented with a history of substance-use-

11

disorder related to opioids, for which he was actively being treated at a methadone clinic where the Defendant was the medical director. [GX 102 at 2]. Over the course of Patient 2's treatment with the Defendant, she prescribed clonazepam and dextroamphetamine-amphetamine. The dextroamphetamine-amphetamine, in conjunction with the methadone Patient 2 received at the methadone clinic or the oxycodone the Defendant would also prescribe him, is known as a "prescription speedball." [Transcript at 597].

Following the initiation of the clonazepam and dextroamphetamine-amphetamine prescriptions, the Defendant began prescribing Vicodin, which was later switched to oxycodone, to treat dental pain. [GX 102 at 132, 147, 460–61]. The Defendant was aware of the risks associated with taking these drugs in combination. [GX 102 at 49, 227, 296, 460]. Additionally, at least two pharmacists, including Ms. McKeown from the Biddeford Walmart, raised concerns with the oxycodone prescription and refused to fill them. [GX 102 at 206, 335, 432]. These prescriptions for dental pain began in August of 2019 and continued through January of 2022. [GX 102 at 132; 460–61].

The charged prescriptions were issued on December 23, 2021. On January 21, 2021, the Defendant's medical assistant, Nancy Drown, documented in a phone note that Patient 2 had called and stated, "he's messed up & have used on & off for past 2 wks . . . ." [GX 102 at 300]. In a visit note on March 15, 2021, the Defendant documented that Patient 2 had been struggling with cocaine and was frustrated because he continued testing positive at the methadone clinic but had been abstinent for nine days. [GX 102 at 333]. In a phone note from August 3, 2021, the Defendant learned that Patient 2 had an episode on July 28, 2021, where Patient 2 believed he had been roofied with ketamine that was in cocaine he used and had been taken into protective custody twice for possible suicidal ideation. [GX 102 at 375].

12

On December 8, 2021, the Defendant documented, "Methadone clinic reports that the patient had a recent suicide attempt via taking 600 mg of methadone and 6 clonazepam. He should not remain on clonazepam and will go to daily dosing on methadone." [GX 102 at 443]. Patient 2 testified that while he was hospitalized, following his suicide attempt, the hospital refused to prescribe him benzodiazepines. [Transcript at 1333]. He went through withdrawals "with the benzos." [Transcript at 1334]. The Defendant reiterated this hardline to her staff in the patient file, but ultimately issued the same three prescriptions, including one for clonazepam, after Patient 2 saw her in person on December 23, 2021. [GX 102 at 460–61].

Dr. King testified that, "If a patient had an active suicide attempt or intentional suicide attempt, that would be further information that he could not be trusted with additional controlled substances as prescribed by Dr. Norris." [Transcript at 627]. Despite this, the Defendant issued Patient 2 a prescription for the same drug he had just attempted suicide with a few weeks prior. [GX 102 at 460–61]. The suicide attempt, even though it did not involve the oxycodone or dextroamphetamine-amphetamine, should have been informed by the same concerns—specifically that Patient 2 used prescribed medication to attempt suicide. Additional controlled drugs should not have been prescribed.

Regarding the oxycodone, above and beyond the fact that the Defendant, who is not a dentist, had been prescribing opioids for dental pain for two years at this point, the visit note in the Defendant's records for December 23, 2021, documents that Patient 2 does not have dental pain; yet the prescription for oxycodone notes that it is being prescribed for dental pain. [GX 102 at 460; GX 3].

The Defendant prescribed high dose fentanyl patches to Patient 3, who was an alcoholic with multiple respiratory-related illnesses or ailments. As the Defendant's employee, Patient 3

was also able to message the Defendant directly through their messaging system to inquire about her prescriptions. On one occasion, Patient 3 messaged the Defendant, referring to herself in the third person, "pt. continues to whine about siatic [sic] pain, numbness ect. [sic] . . . . pt. wondering if she can take either percoset [sic] 10/325 or hydrocodone 5/325. pt. has some from a previous fill. requesting to take something before bedtime. . . . whaa! what do you think?" [GX 103 at 604]. The Defendant told Patient 3 that she could take hydrocodone before bed and asked about Patient 3's drinking. [*Id.*]. Patient 3 represented "both smoking & drinking haven't decreased." On another occasion, Patient 3 messaged the Defendant asking if she could change her fentanyl patches, which were designed to be worn over a period three days, "every 48 hrs instead of 72 hrs." [GX 103 at 847]. The Defendant agreed with Patient 3's request. [*Id.*]. Patient 3 also used the messaging system in August of 2021 to tell the Defendant that she felt none of her "pain meds" were working. [GX 103 at 842].

The jury also heard from Patient 3 directly through her testimony. On direct, her testimony was inconsistent. She told the jury that (1) she felt the best she had ever felt while receiving the fentanyl patches prescribed by the Defendant and that (2) she felt so terrible and was having such trouble breathing that she had to start using an oxygen tank and to stop working for the Defendant. *Compare* [Transcript at 1462 ("A. For a while I was doing just so much better. Q. Did you doing so much better, did that come to an end at a some point? A. Yes. Q. Okay. And when did you doing so much better come to an end? A. Probably when I stopped the fentanyl patch.")] *with* [Transcript at 1466 ("Q. [W]hen, approximately, did you stop working for her? A. It's when I started to get real sick and I had to go on oxygen the whole time.")].

The Defendant knew that Patient 4 was diverting her drugs. Patient 4's treatment history with the Defendant revealed evidence of active drug use, diversion of prescribed medication, and

a lack of efficacy for the controlled drugs prescribed.  Relatively early on in the Defendant's treatment of Patient 4, a named caller called the Defendant's office and reported that Patient 4 was selling her medication and giving medication to her boyfriend.  [GX 104 at 125–26].  The Defendant knew this was true.  The Defendant also treated Patient 4's boyfriend (Patient 1 in the Superseding Indictment) and could see Patient 4's medication in the boyfriend's urine drug test results.  [GX 104 at 126].  There were later references to allegations of diversion in Patient 4's file, which the Defendant seemingly ignored.  [GX 104 at 1498].

Patient 4's file is replete with evidence of her active drug use—from showing up to an appointment impaired, to sounding impaired on the phone on more than one occasion, to repeatedly testing positive for illicit and non-prescribed substances in her urine drug screens.  [GX 104 at 33, 48, 76, 107, 135, 201, 234, 250, 270, 295, 328, 386].  Patient 4 also admitted to using cocaine throughout her treatment and admitted to having slipped and used crack cocaine.  [GX 104 at 1103, 1622].

The file also contained evidence of pharmacist concerns and concerns expressed by other doctors when Patient 4 was seen at local hospitals.  [GX 104 at 656, 1103, 1191, 1375].  Furthermore, despite high-dose opioids, Patient 4 continued to report uncontrolled pain.  For example, in a visit note on February 18, 2022, the Defendant noted that Patient 4 "has a lot of joint pain still and back pain . . . ."  [GX 104 at 1622].  The following month, the Defendant again noted, "has pain all over, 'my bones and also my joints' especially her hip."  [GX 104 at 1642].  In her urine drug test directly before the Defendant issued the charged prescriptions, Patient 4 tested positive for a cocaine metabolite, a metabolite of alprazolam (which is a benzodiazepine), and THC.  [GX 104 at 1672].

Additionally, the Defendant intentionally failed to disclose inculpatory records pertaining

15

to Patient 4 to a regulatory body, the Northeast Unified Program Integrity Contractor ("UPIC"), which monitors payments to providers from Medicare and Medicaid, including payments made by those federal programs for prescriptions. [Transcript at 227]. The UPIC's investigator, Erin Costella, began investigating the Defendant due to the high dosages at which she prescribed opioids. [Transcript at 230]. On May 3, 2022, Ms. Costella sent a letter to the Defendant, reminding the Defendant that she was "required to provide . . . unrestricted access to all documents and records that relate in any way to Medicaid claims and payments," [Transcript at 231], and specifically requested the medical records for eleven patients, including Patient 4, [Transcript at 232]. In requesting the documentation, the letter instructed the Defendant to "provide any other documentation [that the Defendant felt] supports the services billed, as the list of documents [wa]s not all inclusive." [Transcript at 231–32].

The Defendant had thirty days to provide the records. [Transcript at 234]. Ms. Costella knew that the Defendant received the request because she had confirmation from FedEx's shipping information. [Transcript at 234]. After an extension, the Defendant provided the records, which were admitted into evidence. [Transcript at 235; GX 402]. Those records were incomplete, as "[o]nly certain dates of service within the date range [Ms. Costella] requested were provided, and it was difficult to substantiate if the claims were valid and medically necessary based on the information provided." [Transcript at 236].

The disclosed records did not include, for example, an internal communication in Patient 4's chart that discloses that "sally hansen called to tell that [Patient 4] is selling her meds and giving them to her boyfriend." [GX 104 at 125]. And the disclosed records did not include that, in response to that call, the Defendant instructed her staff to tell Patient 4 that the Defendant "g[o]t copies of Patient 1's UAs [urinalysis tests] also" and told her staff to tell Patient 4, "You can tell

16

her 'just as an FYI' but can't say more than that." [GX 104 at 199]. Put simply, the Defendant instructed her staff to let her patient know that her boyfriend was testing positive for her controlled substances. But the Defendant did not provide that record to Ms. Costella. Over the course of the following two weeks, Ms. Costella attempted to reach the Defendant by phone, by e-mail, and through Facebook and LinkedIn messages with accounts associated with the Defendant and her practice. [Transcript at 237–58]. Ms. Costella never received additional records.

Patient 5 arrived at the Defendant's practice in March of 2022, having last received oxycodone from another provider in December of 2021. [GX 105 at 11]. While Patient 5 may have received prescribed controlled substances prior to the Defendant, that did not give her *carte blanche* to prescribe controlled substances outside of the usual course of professional practice and without a legitimate medical purpose. Dr. King testified that, "The practice of medicine requires that a physician do an independent and full evaluation of a patient regardless of what care or regardless of what diagnoses the patient may have had previously." [Transcript at 691]. Here, "a pain diagnosis sufficient to support the use of ongoing opiates was not identified or formulated." [Transcript at 690].

Even if Patient 5 presented as a legacy patient, the Defendant initiated him on new drugs, seemingly in response to what he was sourcing illegally. When Patient 5 told the Defendant that he had "gotten some street methadone since last [they] met," the Defendant responded by "add[ing] methadone . . . to [his] regimen." [GX 105 at 54]. Throughout his course of treatment, Patient 5 had a number of inconsistent urine drug tests, testing positive for THC, methadone, fentanyl, and benzodiazepines. [GX 105 at 24]. On June 3, 2022, the Defendant issued a letter to Patient 5 and added it to the patient's chart. [GX 105 at 127]. In the letter, the Defendant explained, "You have had several non adherent [sic] tox tests since we have started working together. We had yet another

17

one most recently.  I can no longer continue to prescribe controlled substances.  *It is not safe to either one of us, or to the community*.  If you want treatment for a substance use disorder please come in so we can get a real plan together." [GX 105 at 127 (emphasis added)].  The fact that the Defendant flagged that her prescriptions were a danger to the community suggests that she believed that the patient was diverting his drugs.

## B.  History and Characteristics of the Defendant

The Defendant has been afforded every opportunity to succeed in life.  According to information in the PSR, the Defendant's upbringing was devoid of any abuse or neglect.  She maintains close relationships with her family members, including her parents, brother, husband, and adult children.  The Defendant obtained a doctor of osteopathy degree.  Despite her training and privilege, the Defendant repeatedly chose to break the law.  Accordingly, the Defendant's history and characteristics favor the imposition of a significant custodial sentence.  As discussed throughout this memorandum and as presented as trial, the Defendant repeatedly rebuffed the concerns and notices of other professionals and community members, ignored clear signs of relapse and substance abuse in her patients, failed to stop the use of dangerous drugs when they were not working, and took steps to hide her knowledge of signs of abuse and diversion by the patients at issue.  The Defendant had adequate training and education and was aware that her prescribing was not appropriate, yet she still made a conscious and knowing choice to ignore the warnings, relevant medical standards, and presentation of the patients whose prescriptions the jury convicted on.

## C.  Deterrence, Promoting Respect for the Law, and Punishing the Defendant for Her Crimes

A guideline sentence of 16 months is appropriate for the seriousness of the Defendant's criminal conduct and justly punishes her for that conduct.  *See* 18 U.S.C. § 3553(a)(2)(A).  It will

also deter others from engaging in similar illegal conduct.  18 U.S.C. § 3553(a)(2)(B) (requiring district court judges to impose a sentence that affords adequate deterrence, both specific and general).  "General deterrence is about the preventing criminal behavior by the population at large and, therefore, incorporates some consideration of persons beyond the defendant." *United States v. Politano*, 522 F.3d 69, 74 (1st Cir. 2008). As stated by the drafters of 18 U.S.C. § 3553(a), general deterrence is particularly important for white collar criminals to dissuade actors that small fines or low sentences can be dismissed as simply a "cost of doing business." S. Rep. No. 98-225, at 76, 1884 U.S.C.C.A.N 3182, 3259 (discussing white collar crime). As discussed above, the State of Maine, and New England as a whole, have been ravaged by the opioid epidemic over the course of the past decade.  The requested sentence will serve to cause individuals, especially those in a position of power, like the Defendant, to see that deliberately ignoring guidelines, the warnings and concerns of other professionals and community members, and clear signs of abuse and diversion by patients in the context of prescribing controlled drugs is not worth the risk of incarceration.

The requested sentence is also necessary to ensure that the Defendant is deterred from engaging in further criminal conduct, as she was previously put on notice multiple times of the dangerousness of her prescribing but continued prescribing, unabated.  As stated above, the Defendant completely disregarded known prescribing warnings, state and federal standards, and the warnings of other interested parties, such as an insurance company, a pharmacist, Walmart, and community members.  The Defendant was aware of the problems with her prescribing but continued on the same course—unabated by relapses, a suicide attempt, reports of diversion, inconsistent urine drug test results, and continued alcohol use.  She was so aware of the problems with her prescribing that her own controlled substance agreement instructed patients to keep her

identity a secret, so that she would not be contacted by those looking to report diversion. Her conviction and resulting sentence should serve to show the Defendant that her belief in her own medical superiority does not trump the applicable guidelines and the law.

### D. Avoiding Unwarranted Sentencing Disparities

As discussed above, one of the central reasons for creating the sentencing guidelines was "to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *Musgrave*, 761 F.3d at 609. Recognizing the ongoing opioid crisis, defendants in similar positions to this Defendant need to be deterred from harming their patients and communities at large. To avoid unwarranted sentencing disparities among defendants, as contemplated in 18 U.S.C. § 3553(a)(6), the Defendant should be sentenced to a period of incarceration. "Section 3553(a)(6) instructs sentencing courts to consider […] the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct . . . ." *United States v. Marinaro*, 2005 U.S. Dist. LEXIS 6877, 31 (D. Me. Apr. 13, 2005). Other medical professionals, who have distributed controlled drugs outside the scope of their professional practice and not for legitimate medical purposes, have been sentenced to periods of incarceration:

- In *United States v. Crystal Compton* and *United States v. Kayla Lambert*, 7:22-CR-0007 (E.D. Ky.), the defendant physician and nurse were convicted of conspiracy to illegally prescribe controlled substances outside the scope of professional practice and were sentenced to 100 months and 60 months incarceration, respectively.

- In *United States v. George Griffin*, 1:19-CR-112 (S.D. Ohio), the defendant physician pleaded guilty and was convicted of unlawful distribution of controlled

substances outside the scope of professional practice and was sentenced to 40 months incarceration.

- In *United States v. Morris Brown*, 3:19-CR-92 (S.D. Ohio), the defendant physician pleaded guilty and was convicted of unlawful distribution of controlled substances outside the scope of professional practice and was sentenced to 48 months incarceration.

- In *United States v. Larry Boatwright*, Cr. No. 06-20099 (W.D. Tenn.), the 57-year-old defendant, a pharmacist, was convicted of distributing controlled substances outside the scope of professional practice and was sentenced to a period of 188 months (which was later reduced to 151 months).

- In *United States v. Rosaire Michael Dubrule*, 2:07-CR-20246-01 (W.D. Tenn.), the 62- year-old defendant, a physician, was convicted of conspiracy and unlawful distribution of controlled substances outside the scope of professional practice and was sentenced to a period of 150 months with the recommendation that the defendant be designated to a Federal Medical Facility.

- In *United States v. Michael Patterson*, 2:11-CR-20262 (W.D. Tenn.), the defendant physician was convicted of unlawful distribution of controlled substances outside the scope of professional practice and sentenced to 192 months.

- In *United States v. Thomas Romano*, 2:19-CR-202 (S.D. Ohio), the defendant physician was convicted of unlawful distribution of controlled substances outside the scope of professional practice and sentenced to 84 months.

- In *United States v. Adnan Khan*, 2:24-CR-43 (D. Vt), the defendant physician pleaded guilty and was convicted of conspiracy to distribute buprenorphine outside

21

the scope of professional practice and was sentenced to 8 months.

The government acknowledges that every case is different and the specific facts and circumstances of each defendant should be evaluated in reaching a sentencing decision. The government includes these case comparisons, however, to demonstrate that other defendants with similar training and convictions to this Defendant have been sentenced to periods of incarceration. Accordingly, based upon all of the above, a sentence of 16 months' incarceration would be appropriate based on the Sentencing Guidelines and the factors articulated in 18 U.S.C. § 3553(a).

### V. Supervision Conditions

The government requests a three-year term of supervised release pursuant to the Controlled Substances Act requirement that such a term follow any period of incarceration for this offense. *See* 21 U.S.C. § 841(b)(1)(C). The government respectfully requests that the Defendant be barred from the practice of medicine[3] during the period of supervision and that she be prohibited from applying for new licenses as a doctor of osteopathy, seeking reinstatement of licenses as a doctor of osteopathy, or reapplying for a DEA registration. The government further respectfully requests that the Defendant be prohibited from working in any medical setting during the term of supervision.

### Conclusion

For the foregoing reasons, the government respectfully submits that a Guidelines sentence would satisfy the directives of 18 U.S.C. § 3553(a). The government respectfully recommends that this Court sentence the Defendant to a term of imprisonment of 16 months, followed by three

---

[3] The website for the Maine Board of Osteopathic Licensure lists the Defendant's license as "active" as of this filing.

years of supervised release, and order a special assessment of $1,500.

Respectfully Submitted,

CRAIG M. WOLFF
ACTING UNITED STATES ATTORNEY
DISTRICT OF MAINE

LORINDA LARYEA, ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE


May 8, 2025                    By: */s/ Danielle H. Sakowski*
                               Thomas D. Campbell
                               Danielle H. Sakowski
                               Trial Attorneys
                               United States Department of Justice,
                               Criminal Division, Fraud Section
                               1400 New York Avenue, N.W.
                               Washington, D.C. 20005
                               Telephone: (202) 631-5984
                               Thomas.Campbell@usdoj.gov
                               Danielle.Sakowski@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 8, 2025, I electronically filed the foregoing Government's Sentencing Memorandum with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Timothy Zerillo, Esq.
Karen Wolfram, Esq.
Amy Fairfield, Esq.

*/s/ Danielle H. Sakowski*
Thomas D. Campbell
Danielle H. Sakowski
Trial Attorneys
United States Department of Justice,
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 631-5984
Thomas.Campbell@usdoj.gov
Danielle.Sakowski@usdoj.gov